**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**RANDY NICHOLS**                                                                      **PLAINTIFF**

**v.**                                 **Case No. 4:12-cv-00232-KGB**

**THE PROCTER & GAMBLE LONG
TERM DISABILITY ALLOWANCE
POLICY**                                                                                **DEFENDANT**

_____

**THE PROCTER & GAMBLE LONG
TERM DISABILITY ALLOWANCE
POLICY**                                                                  **COUNTER-PLAINTIFF**

**v.**

**RANDY NICHOLS**                                                   **COUNTER-DEFENDANT**

<u>**OPINION AND ORDER**</u>

Plaintiff Randy Nichols brings this action pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. Mr. Nichols claims that defendant, The Proctor & Gamble Long Term Disability Allowance Policy ("the Plan"), unlawfully denied him long-term disability benefits. The Plan denies liability and asserts a counterclaim seeking repayment of allegedly overpaid benefits. Before the Court is Mr. Nichols's motion for summary judgment (Dkt. No. 17). Also before the Court is the Plan's motion for summary judgment filed in response (Dkt. No. 18). Mr. Nichols has replied (Dkt. No. 20). For the reasons that follow, the Court denies Mr. Nichols's motion (Dkt. No. 17) and grants the Plan's motion (Dkt. No. 18).

**I.       FACTUAL BACKGROUND**

Mr. Nichols was employed as a production tech by The Proctor & Gamble Paper Products Company's ("P&G") Russellville facility from February 13, 2000, until April 6, 2008

(Dkt. No. 1, ¶ 5; Dkt. No. 16, R. 280[1] ).  Mr. Nichols was a participant in the Plan through his employment with P&G  (Dkt. No. 1, ¶ 9; Dkt. No. 18-1, at ¶ 3).  Mr. Nichols began receiving benefits from the Plan on April 14, 2008, being designated "totally disabled" under the Plan's definitions.  On August 21, 2009, the Plan changed Mr. Nichols's status to "partially disabled," effective August 1, 2009.  Mr. Nichols appealed the determination of "partial disability."  The Plan upheld the decision in December 2009.  Mr. Nichols exhausted his partial disability benefits on July 30, 2010.  Through counsel, Mr. Nichols submitted a second appeal on March 20, 2011.  On June 29, 2011, the Plan notified Mr. Nichols's counsel that it was upholding the determination of partial disability.

## A.      Plan Benefits and Administration

The "Plan" actually has two disability plans—one for short-term disability ("STD") and one for long-term disability ("LTD") benefits.  A participant who is partially or totally disabled is paid STD benefits for up to 52 weeks (Dkt. No. 16, R. 665-67, 707-09).  After receiving 52 weeks of STD benefits, participants who continue to be totally or partially disabled will receive LTD benefits.  The duration of LTD benefits depends on whether the participant is partially disabled or totally disabled within the meaning of the Plan.  LTD benefits for a partial disability are limited to a 52-week lifetime maximum.  The Plan defines "partial disability" and "total disability" as follows:

> *"Partial Disability"* means a mental or physical condition resulting from an illness or injury because of which the Participant is receiving medical treatment and cannot perform regular duties of his or her current job but can perform other roles at the same site or other jobs outside of the Company.  Thus, a condition of Partial Disability does not necessarily prevent the Participant from

---

[1]   The parties filed a stipulated record (Dkt. No. 16).  For clarity and for consistency with the parties' briefing, the Court cites to the stipulated record by reference to the bates number appearing at the bottom-right corner of each page.

performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home.

> *"Total Disability"* means a mental or physical condition resulting from an illness or injury which is generally considered totally disabling by the medical profession and for which the Participant is receiving regular recognized treatment by a qualified medical professional.  Usually, Total Disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home.  The Trustees reserve the right to determine what is considered as "regular" and "recognized treatment."

(Dkt. No. 16-9, at 3-4).

The Plan administrator is a Board of Trustees ("Trustees"), comprised of four members who are employees of P&G (Dkt. No. 16, R. 671-72).  The Trustees are not compensated out of the Fund.  The Plan expressly vests the Trustees with discretionary authority to interpret the Plan and to make determinations of entitlement to benefits:

> The Board of Trustees shall have the power and authority to devise and make effective from time to time such procedures as may, in its judgment, be advisable or necessary to carry out the provisions of this Plan.  The Trustees have the discretionary authority to interpret the terms of this Plan, to determine the facts underlying any benefits claims and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of this Plan.  Determination by the Trustees as to the interpretation and application of this Plan in any particular case shall be conclusive on all interested parties and their action shall not be subject to any review.

(Dkt. No. 16, R. 673).

To receive disability benefits under the Plan, a participant must file an application for benefits with the appropriate local or corporate reviewing board and must have his or her physician certify the disability (Dkt. No. 16-9, R. 669; Dkt. No. 18-2).  The local or corporate reviewing board consists of four employees of P&G or its subsidiaries who do not receive additional compensation for their roles on these boards (Dkt. No. 16, R. 669; Dkt. No. 18-2).  The reviewing board's decision is communicated to the participant by the Chair of the Board of Trustees.  A claim granted by the reviewing board is not further reviewed by the Trustees, but if

the reviewing board denies disability benefits, the participant has the right to appeal the decision to the Board of Trustees (Dkt. No. 18-2).

The Plan provides that "it is the participant's burden to establish by objective medical evidence that he or she is either totally or partially disabled, as the terms are defined in the Plan" (Dkt. No. 16, R. 669, 682, 712).  To remain classified as "totally disabled," participants must confirm their continuing disability by providing initial and thereafter regular statements from the doctor on their status.  It is, therefore, the responsibility of any participant receiving continuing disability to ensure a completed Physician's Certificate is submitted with the Disability Benefits Claims Administrator on a regular (as frequently as monthly) basis  (*Id.* at 669, 688-689, 711).

In addition, the Trustees can require as a condition of receiving benefits that a participant submit to a physical examination by a doctor chosen by the Plan.  The Trustees can also request that a participant undergo an Independent Medical Examination ("IME").  The participant "may refuse to participate [in the IME]; however, failure to participate may result in denial of disability benefits" (Dkt. No. 16, R. 669, 682, 712).  A participant who is "partially disabled" but experiences a change in his or her medical condition can provide medical evidence of such changes to the reviewing board and may be determined to be "totally disabled" (*Id.*, at 683, 713).  The Trustees review the medical examinations ordered by the Plan and other medical reports, including reports from the participant's own physician, to reach a decision regarding benefits under the Plan (*Id.* at 669).

In addition, the Plan provides that "an award of [Social Security Disability Income ("SSDI")] benefits will not be binding or determinative of the Trustees' decision, but if the participant provides the documentation on which such award was based, that information will be

considered along with other evidence and given such weight as the Trustees believe it merits under the circumstances" (Dkt. No. 16, R. 670, 686, 716).

## C. Mr. Nichols's Benefits Claims

Mr. Nichols's last day of work was April 6, 2008 (Dkt. No. 16, R. 279).  On April 23, 2008, he applied for benefits under the Plan, claiming total disability effective April 14, 2008, due to degenerative disc disease, spinal stenosis, and related ailments (*Id*. at 280).  His application was supported by an April 24, 2008, Attending Physician's Statement ("APS") from Dr. Michael D. Kaploe, a family medicine specialist, which listed a primary diagnosis of spinal stenosis and a secondary diagnosis of lumbar radiculopathy (*Id*. at 354).[2]  Dr. Kaploe's APS states that Mr. Nichols first consulted him regarding this condition on April 7, 2008 (*Id.*). Follow-up APSs were provided by Mr. Nichols's neurosurgeon, Dr. Scott Schlesinger, whom Mr. Nichols began seeing on April 25, 2008 (*Id*. at 357, 362).

In addition, Mr. Nichols began seeing Dr. Columbus Brown, a rheumatologist, on July 1, 2008.  Dr. Brown wrote a letter dated September 25, 2008, stating that, due to the severity of Mr. Nichols's pain, Mr. Nichols was only able to stand or walk for about fifteen minutes without having to sit and rest for at least five minutes and that Mr. Nichols was not able to carry, handle, or lift objects greater than 20 pounds without great difficulty and additional pain (Dkt. No. 16, R. 66).  Dr. Brown submitted an APS dated October 20, 2008, which states that Mr. Nichols's return-to-work plans were "unknown" (*Id*. at 405).  On December 1, 2008, Dr. Brown submitted a return-to-work slip stating that Mr. Nichols could return to work if allowed two hours per shift,

---

[2]   The stipulated record includes a detailed chronology maintained by the Reed Group, the Plan's medical administrator, which summarizes the communications with Mr. Nichols and his medical doctors (Dkt. No. 16, R. 283-352; Dkt. No. 18-1, ¶ 23 n.3).

5

that "these will likely be lifelong restrictions for this job," and that Mr. Nichols "will likely miss too many days of work because of pain to be productive" (*Id*. at 409).

The Plan arranged and scheduled a Functional Capacity Exam ("FCE") for Mr. Nichols for December 19, 2008, which was performed by David Wilbanks, a physical therapist at River Valley Therapy & Sports Medicine (Dkt. No. 16, R. 412-20).   The FCE determined that Mr. Nichols was functioning at a Limited Light Duty work level (*Id.* at 413).   The FCE was sent to Dr. Brown, who responded to the Plan on January 6, 2009, that he concurred with the FCE but added that the FCE could not measure pain levels after work; Dr. Brown stated that Mr. Nichols could not return to work (*Id*. at 327).   Dr. Schlesinger stated in a progress note dated January 20, 2009, that Mr. Nichols would be restricted to the stipulations stated in the FCE (*Id*. at 483).

On January 20, 2009, Dr. Jasen Chi, a rheumatologist, performed an IME on Mr. Nichols at the Plan's request (Dkt. No. 16, R. 484-91).   Dr. Chi concurred with Dr. Brown's assessment that the impairments from Mr. Nichols's pain could significantly impact his activities of daily living and decrease his ability to work.   Dr. Chi wrote that he did not feel that Mr. Nichols would be able to work in any significant capacity (*Id*. at 490).

On February 12, 2009, Dr. Schlesinger performed an anterior cervical decompression and fusion (Dkt. No. 16, R. 72, 236).   In an APS the day prior to the surgery, Dr. Schlesinger estimated that Mr. Nichols would return to work on March 23, 2009 (*Id*. at 493).   The day after surgery, February 13, 2009, Dr. Schlesinger wrote that Mr. Nichols "says he can tell a big difference in his arms already with excellent relief of his radicular pain" (*Id*. at 105).   On March 25, 2009, Dr. Schlesinger wrote to Dr. Kaploe that Mr. Nichols "is doing great from his surgery and is without any complaints" (*Id*. at 496).   Dr. Schlesinger released Mr. Nichols from his care unless Mr. Nichols's return became necessary (*Id*.).

Dr. Brown recorded in an April 20, 2009, progress note that Mr. Nichols was doing better since surgery with Dr. Schlesinger (Dkt. No. 16, R. 503).  However, Dr. Brown wrote in an APS of the same date that Mr. Nichols had constant complaints of pain in his cervical and lumbar spine.  Dr. Brown wrote that Mr. Nichols's estimated return-to-work date was unknown and that Mr. Nichols would need to be off for the next six months, through October 20, 2009 (*Id*. at 500-01).

On April 28, 2009, the Plan determined that it needed additional information concerning Mr. Nichols's present condition as the Plan believed it was "unable to extend the case" with the information in its possession (Dkt. No. 16, R. 335-36).  On April 29, 2009, the Plan requested an APS from Dr. Columbus Brown, noting the specific questions, "Why can't [Mr. Nichols] return to work?  What are his current limitations?" (*Id*. at 504).  Dr. Brown responded on April 29, 2009, that Mr. Nichols was being treated for degenerative disc disease in the cervical and lumbar spines with secondary spinal stenosis that causes daily constant pain in his neck and lower back, and stated, "Due to the severity of his daily pain he is unable to work in any capacity at this time."  (*Id*. at 505).  Dr. Brown submitted another APS on July 7, 2009, repeating the same recommendation and stating that Mr. Nichols's estimated return to work was unknown (*Id*. at 507).  The Plan noted that this APS provided "no new information to support db [disability benefits]" (*Id*. at 338).  A nurse with the Reed Group recorded on July 16, 2009, that she tried to explain to Mr. Nichols that he needed to be in regular care while on disability benefits, noting that he had not seen Dr. Brown since April 2009 and did not have an appointment until October 2009 (Dkt. No. 16, R. 338).

By letters dated August 20, 2009, and August 21, 2009, the Corporate Reviewing Board informed the Trustees and Mr. Nichols of its determination that there was no recent objective

medical evidence indicating a totally disabling condition and that Mr. Nichols's benefits would be terminated effective August 1, 2009 (Dkt. No. 16, R. 179-80, 527).  The letter to Mr. Nichols indicated that the Corporate Reviewing Board lacked current information on Mr. Nichols's condition to indicate that his condition was of such severity as to preclude his work or support restricted duty (*Id*. at 179).  The Reviewing Board's letter informed Mr. Nichols that, in order to perfect his claim for benefits, he would need to submit additional objective medical documents indicating that he was disabled as defined by the Plan beyond the date of denial (*Id*.).  In addition, the letter informed Mr. Nichols of his right to appeal the decision to the Trustees and to bring a civil action under ERISA § 502(a), if he filed an appeal and was denied following review (*Id*. at 180).

Mr. Nichols appealed the Corporate Reviewing Board's decision on September 1, 2009 (Dkt. No. 16, R. 47, 164-65).  Mr. Nichols stated in his appeal that the nurse at the Reed Group did not have his correct phone number and that he had never been told that he needed to see a doctor on a continuing basis to maintain his disability (*Id*. at 165).  At the request of the Plan, Dr. Jef Lieberman, an internist and rheumatologist, reviewed Mr. Nichols's file, including but not limited to notes and other records from Dr. Brown, Dr. Schlesinger's progress notes, the January 20, 2009, IME performed by Dr. Chi, and an Administrative Law Judge ("ALJ")'s decision related to Mr. Nichols's Social Security claim dated August 11, 2009 (*Id*. at 212-15).

Dr. Lieberman submitted his findings and conclusions to the Plan on September 18, 2009 (Dkt. No. 16, R. 212).  Dr. Lieberman acknowledged Mr. Nichols's back and neck-related conditions, and he concluded that the medical evidence before him did not show physical "objective findings of deficits" to indicate a complete inability to work from August 1, 2009 (*Id*. at 215).  Dr. Lieberman opined that Mr. Nichols could perform sedentary occupations on a full

time basis, so long as he did not need to twist or turn his neck or back substantially, had the opportunity to move for five minutes every 30 to 60 minutes, and did not have to climb stairs or regularly lift items more than ten pounds (*Id*. at 214-15).  Dr. Lieberman qualified his opinion by stating that, if MRI Reports completed in May and December 2008 indicated spinal cord impingement, this along with Mr. Nichols's symptoms would be enough to prevent him from performing full-time gainful employment (*Id*. at 215).

The Plan informed Mr. Nichols on October 9, 2009, that the Trustees needed additional time to review his appeal (Dkt. No. 16, R. 163).  In order to process his appeal, the Plan requested additional information from Mr. Nichols, including information he submitted to Social Security in June 2008 and reports of his MRIs of May 14, 2008, and December 20, 2008 (*Id*.).

On November 11, 2009, Dr. Lieberman submitted a follow up report which considered additional medical records from Dr. Kaploe (through November 14, 2008), Dr. Schlesinger (through February 2009), Dr. Brown (through April 2009), and physical therapy (through May 20, 2009) (Dkt. No. 16, R. 619-22).  Dr. Lieberman found Dr. Schlesinger's records to be the "salient aspects of the additional records," and he cited Dr. Schlesinger's interpretation that previous MRIs did not show significant compression (*Id*. at 621).  Dr. Lieberman concluded that there was "no substantial objective medical information to suggest an inability to work in a sedentary capacity" (*Id*.).  In his opinion, the objective medical evidence indicated that Mr. Nichols could perform sedentary work, so long as he did not lift items over ten pounds or perform overhead work, and so long as he could move around approximately five minutes every 30 to 60 minutes (*Id*. at 621-22).

On December 4, 2009, the Trustees wrote to Mr. Nichols to inform him that they determined that he did not qualify as totally disabled because there was sufficient objective

medical data to conclude that he was capable of sedentary work and, accordingly, determined that Mr. Nichols was partially disabled as defined in the Plan (Dkt. No. 16, R. 47-48, 624-25). In granting partial disability, the letter noted that the Plan limits partial disability to 52 weeks and advised Mr. Nichols that he could notify the Plan if his medical condition changed to Total Disability during the time he was receiving partial disability payments (*Id*. at 48).

On September 2, 2010, the Plan informed Mr. Nichols that he had exhausted his lifetime limit of 52 weeks of Partial Disability payments effective July 20, 2010 (Dkt. No. 16, R. 39). The Trustees' September 2, 2010, letter informed Mr. Nichols that he had the right to appeal the decision, informed him to submit any additional information that may support his position, and informed him of the procedural requirements to perfect an appeal (*Id*.).

Mr. Nichols, through his attorney, submitted an appeal on March 10, 2011 (Dkt. No. 16, R. 8, 22).  In support, Mr. Nichols submitted reports from Dr. Brown of October 20, 2009, and April 19, 2010 (*Id*. at 29, 24).  These reports reflected Mr. Nichols's complaints of pain but did not address his ability to work (*Id*.).  Mr. Nichols also submitted a December 7, 2010, Functional Capacity Questionnaire ("FCQ") prepared by Dr. Brown (*Id*. at 35-38).  Dr. Brown's FCQ stated that the severity of Mr. Nichols's pain and the stress caused by it prevented work of any kind (*Id*. at 36).  However, Dr. Brown's FCQ also stated that Mr. Nichols was capable of short-duration sedentary work functions, such as:  walking two city blocks, sitting for 15 minutes at a time, standing for five minutes at a time, and doing both for up to two hours during an eight-hour work day; occasionally lifting objects of ten pounds or less; and reaching and handling items (*Id*. at 36-38).  This is the last medical report in the record Mr. Nichols submitted to the Plan.

In processing his appeal, the Trustees determined that another IME and FCE were necessary.  By letter dated March 24, 2011, the Trustees informed Mr. Nichols that he had been

scheduled for a FCE (Dkt. No. 16, R. 628).  The FCE was conducted on April 11, 2011, by

David Wilbanks, the therapist who had performed Mr. Nichols's FCE in January 2009.  The FCE

report notes that Mr. Nichols complained of pain in the lower back, upper back, and shoulders

during testing and changed positions frequently (*Id*. at 649).  However, the report states, "[b]ased

on objective functional testing, Mr. Nichols is functioning at an undetermined work level.

Inadequate data was collected due to patient refusing to complete the evaluation.  The data

collected indicated that all abilities tested would fall into a rare to occasional work basis"  (*Id*.).

On April 25, 2011, the Plan notified Mr. Nichols that it required an IME to decide the

appeal (Dkt. No. 16, R. 21).  However, Mr. Nichols did not appear for the appointment for the

IME (*Id*. at 8).  The Plan rescheduled the IME for May 11, 2011 (*Id*. at 657).  Mr. Nichols

appeared for this IME, which was to be performed again by Dr. Chi, the physician who

performed Mr. Nichols's previous IME in 2009.  Dr. Chi was unable to complete the IME

because Mr. Nichols would not allow Dr. Chi to continue his physical examination and "became

very vulgar and rude and became very accusatory" to Dr. Chi (*Id*. at 659).  Dr. Chi's report

states, in part:

> Throughout the short, roughly four minute, interval that I saw him, he became
> very bitter at Proctor & Gamble . . . .  At one point in time he became very vulgar
> and rude and became very accusatory to me, stating, "It is idiots like you that
> keep patients sitting in their waiting room and I can't handle this."  Throughout
> the conversation and within a short period of time he became very blasphemous
> and very vulgar in his comments to me.

(Dkt. No. 16, R. 659).

On May 12, 2011, the Trustees received a letter from Mr. Nichols, through his attorney,

in which he described his general pain symptoms as well as the discomfort he experienced

during the April 11, 2011 FCE (Dkt. No. 16, R. 18-20).  The Trustees wrote back to Mr.

Nichols's attorney on May 26, 2011, noting that Mr. Nichols had failed to complete the FCE or

IME but stating that the Plan would attempt to schedule another FCE and IME for Mr. Nichols (*Id*. at 16).   The Plan requested the assistance of Mr. Nichols's attorney in ensuring Mr. Nichols's attendance and cooperation.   The Plan stated that the Trustees would be forced to evaluate Mr. Nichols's appeal based only on the existing medical information if they did not receive a completed FCE or IME by June 9, 2011 (*Id*.).

On May 31, 2011, the Trustees received a hand-written letter from Mr. Nichols describing the pain and wait he experienced at the IME, his general limitations, and other complaints (Dkt. No. 16, R. 11-15).   The Trustees did not hear from Mr. Nichols again, and Mr. Nichols did not reschedule the FCE or IME.

The Trustees issued a final denial of Mr. Nichols's appeal on June 29, 2011 (Dkt. No. 16, R. 7-9).   The Trustees upheld the determination of partial disability, citing the Plan's definition of total disability and concluding, based on objective medical evidence available to them, that Mr. Nichols was not disabled on July 30, 2010, because the objective evidence indicated that he could perform sedentary work (*Id*. at 8).   Being partially disabled, Mr. Nichols could no longer receive benefits because he had exhausted the Plan's 52 weeks of LTD coverage for partial disability.

### D.    Counterclaim – Social Security Award

The Plan provides that disability benefits paid under the plan are reduced by SSDI payments (Dkt. No. 16, R. 668, 677, 681, 685-86, 709, 716).   The Plan requires participants who are eligible for SSDI benefits to apply for such benefits from the Social Security Administration ("SSA") and inform the Plan of the result of the application.   Any overpayment of benefits made by the Plan must be reimbursed, and the failure to do so may result in termination from the Plan (*Id*).   On August 11, 2009, Mr. Nichols was awarded SSDI benefits retroactive to April 7, 2008, after the ALJ concluded that there were no jobs to match Mr. Nichols's experience and the

limitations caused by his degenerative disc disease, spinal stenosis, diabetes, and neuropathy into the right lower extremity (*Id.* at 166-78, 186-87, 189).  Mr. Nichols did not immediately notify the Plan of his award of SSDI benefits.  By letter dated February 12, 2009, the Plan alerted Mr. Nichols that it required him to provide notification of any Social Security award and requested such documentation.  After learning of Mr. Nichols's SSDI benefits, the Plan's December 4, 2009, letter regarding the decision on partial disability stated that, before Mr. Nichols's partial disability benefits could begin, the Plan needed to receive Mr. Nichols's SSA award letter (*Id.* at 48).  Mr. Nichols did not provide the relevant SSA award letter until the summer of 2020 (*Id.* at 186, 188-89, 191, 204).

On November 30, 2010, the Plan notified Mr. Nichols that he had an outstanding debt to the Plan in the amount of $11,028.00, due to his receipt of $1,248.20 per month from the SSA retroactive to October 2008 (Dkt. No. 16, R. 184).  On June 14, 2011, the Corporate Reviewing Board sent Mr. Nichols a second notification of the outstanding debt (*Id.* at 182).  The Plan contends that Mr. Nichols has not reimbursed the Plan for the payments made during the months Mr. Nichols also was paid SSDI benefits (Dkt. No. 18-1, ¶ 13).  Mr. Nichols appears to admit overpayment in his briefing but does not concede an amount (Dkt. No. 20, at 4).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of

material fact.  *Celotex*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)

### III.    MR. NICHOLS'S ERISA CLAIM

Pursuant to ERISA § 502(a)(1)(B), a participant or beneficiary of an employee benefit plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."   29 U.S.C. § 1132(a)(1)(B); *see* 29 U.S.C. § 1002(7), (8) (defining "participant" and "beneficiary" under ERISA).

### A.    Standard of Review

The parties agree on the standard of review for an ERISA plan that, as is the case here, grants the administrator discretionary power.   "Where a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations, . . . the administrator's decision is reviewed only 'for abuse . . . of his discretion,' and the administrator's interpretation of uncertain terms in a plan 'will not be disturbed if reasonable.'"   *King v. Hartford Life & Acc. Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).  Courts have identified several factors to be

considered in determining the reasonableness of the plan administrator's decisions.  These include "whether their interpretation is consistent with the goals of the Plan, whether their interpretation renders any language of the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they have interpreted the words at issue consistently, and whether their interpretation is contrary to the clear language of the Plan." *Id.* at 999 (quoting *Finley v. Special Agents Mut. Benefit Assoc., Inc.*, 957 F.2d 617, 621 (8th Cir. 1992)).  "These so-called '*Finley* factors' inform [the Court's] analysis, but [t]he dispositive principle remains . . . that where plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace [it] with an interpretation of their own—and therefore cannot disturb as an abuse of discretion the challenged benefits determination." *Id.* (internal quotations omitted).  "Any reasonable decision will stand, even if the court would interpret the language differently as an original matter." *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010); *see also Rutledge v. Liberty Life Assurance Co.,* 481 F.3d 655, 659 (8th Cir.2007) ("[W]e must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.").

Abuse-of-discretion review "ensures that an administrator's decision is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *King*, 414 F.3d at 999-1000  (internal quotations omitted).  "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 887 (8th Cir. 2002).  The Court "must focus on the evidence available to the

plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." *Conley v. Pitney Bowes,* 176 F.3d 1044, 1049 (8th Cir. 1999).

The Court's review must consider the conflict of interest that exists when, as is the case here, "the entity that administers the plan 'both determines whether an employee is eligible for benefits and pays benefits out of its own pocket'. . . ." *Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 775 (8th Cir. 2009) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)).  Although the presence of a conflict of interest does not alter the abuse of discretion standard of review, the Court "should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits[.]" *Glenn*, 554 U.S. at 108. "[T]he significance of the factor will depend upon the circumstances of the particular case." *Id*. When an insurer has a history of biased claims administration, the conflict should prove more important.  *Manning*, 604 F.3d at 1039; *Glenn*, 554 U.S. at 117.  However, the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117.

The Plan argues extensively that the Court give minimal or no weight to this conflict of interest, asserting that it is Mr. Nichols's burden to establish the impact of the conflict and citing several mitigating factors (Dkt. No. 19, at 4-7).  Mr. Nichols makes no argument on conflict. Based upon the parties' arguments and the administrative record before it, the Court gives the issue of conflict minimal weight.

B.      **No Abuse of Discretion**

The sole issue is whether the Trustees abused their discretion in finding that Mr. Nichols was "partially disabled," not "totally disabled," effective August 1, 2009.  As noted above, "total disability" requires a condition "generally recognized as totally disabling by the medical profession" and involves a condition "of such severity as to require care in a hospital or restriction to the immediate confines of the home."  On the other hand, "partial disability . . . does not necessarily prevent the Participant from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home."  The Court finds that, even viewing the evidence in the light most favorable to Mr. Nichols, Mr. Nichols has not presented a genuine issue of material fact that the Plan abused its discretion in denying his LTD benefits.  To the contrary, the Court finds that the Plan did not abuse its discretion.  Therefore, the Plan is entitled to summary judgment on Mr. Nichols's ERISA claims.

A finding that the Plan abused its discretion requires a finding that the Trustees' decision was unreasonable and not supported by "such relevant evidence as a reasonable mind might accept as to support a conclusion."  *King*, 414 F.3d at 999-1000.  The Court cannot say that the Trustees' decision that Mr. Nichols is partially disabled and not totally disabled was not reasonable or supported by substantial evidence.

First, the Court agrees with the Plan that there is substantial evidence to support the Trustees' decision based on the conclusion that the objective medical evidence indicated Mr. Nichols could perform sedentary work (Dkt. No. 19, at 12).  As the Plan notes, Dr. Schlesinger remarked after the February 12, 2009, surgery that Mr. Nichols was "doing great from surgery and is without any complaints" and discharged Mr. Nichols from his care.  Dr. Brown also recognized the improvement after surgery, and though he continued to recommend that Mr.

Nichols not return to work, he provided little information in response to the Plan's request for elaboration. Further, Dr. Lieberman concluded in his two reports that there was no substantial objective medical evidence to suggest an inability to work in a sedentary capacity. As the Plan notes, the Eighth Circuit has found that even one FCE alone constitutes more than a scintilla of evidence, *Jackson*, 303 F.3d at 888, and therefore, Dr. Lieberman's reports alone should be sufficient to support the Trustees' decision.

Moreover, much of the medical evidence cited by Mr. Nichols predates the February 12, 2009, surgery, such as Dr. Schlesinger's pre-surgery assessments and the January 2009 IME performed by Dr. Chi (Dkt. No. 17, at 2-4). To the extent Mr. Nichols cites Dr. Brown's December 7, 2010, FCQ that stated that Mr. Nichols's was incapable of even low-stress jobs, the Court notes two points. First, the FCQ also stated that Mr. Nichols was capable of short-duration sedentary work functions, and therefore, the FCQ does not necessarily conflict with Dr. Lieberman's conclusion upon which the Plan contends it relied (Dkt. No. 16, R. 35-38). Second, even if Dr. Brown's records conflicted with Dr. Lieberman's report, this would not establish that the Trustees abused their discretion. *See Weidner v. Fed. Exp. Corp.*, 492 F.3d 925, 930 (8th Cir. 2007) ("ERISA affords courts 'no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'") (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, (2003)); *see also Dillard's Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d 894, 899-900 (8th Cir.2006) (rejecting the contention that the plan administrator abused its discretion when it "credited [a peer reviewer's] analysis over [a primary care physician's] conclusions because [the peer reviewer] did not physically examine [the claimant].").

Mr. Nichols argues that the Trustees acted arbitrarily and capriciously by disregarding Mr. Nichols's reports of pain.  Mr. Nichols cites several cases for the proposition that "[b]ecause a claimant need not present clinical or diagnostic evidence to support the severity of pain, a plan administrator cannot discount self-reports of pain because the objective medical evidence does not fully support them" (Dkt. No. 17, at 6).  However, Mr. Nichols's argument is predicated on case law regarding a denial of Social Security benefits.  *See O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003) (noting that in Social Security cases, "an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them.").  This is not controlling, or even particularly persuasive, law for this ERISA case.  The Eighth Circuit has expressly held that it is not an abuse of discretion to deny a claim where *objective* evidence is lacking, specifically where the Plan language requires objective medical evidence.  *See Manning*, 604 F.3d at 1041 ("Generally, '[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence.'") (quoting *Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 813 (8th Cir. 2006) (finding no abuse of discretion in denying benefits based on plan language requiring objective medical evidence of disability and on the absence of objective evidence of allegedly disabling fibromyalgia)).  Likewise, the Court is not persuaded by Mr. Nichols's reliance on Dr. Brown's reports and conclusions based solely on Mr. Nichols's complaints of pain or his statement that his physician in general "reported uncontrollable pain" (Dkt. No. 17, at 2-3, 6).  *See Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 841 (8th Cir. 2006) (finding no abuse of discretion when there was no objective proof of disabling fibromyalgia in a treating physician's letter that merely repeated the participant's subjective complaints of pain and fatigue and specifically noting the plan's repeated requests for objective evidence).

The Court also rejects Mr. Nichols's reliance on the determination that he is totally disabled for purposes of SSDI.  The Plan specifically states that Trustees are not bound to accept findings of the SSA in regard to SSDI but that documentation submitted for SSDI will be considered if also submitted to the Trustees.  Here, Mr. Nichols submitted such information, and it was considered.  Moreover, the Eighth Circuit is clear that the SSA's determinations do not control the Plan's conclusions.  *See, e.g.*, *Carrow v. Standard Ins. Co.*, 664 F.3d 1254, 1259 (8th Cir. 2012) ("[W]hile the Social Security Administration (SSA) found that Carrow was disabled within the meaning of its regulations, Plan administrators are not bound by SSA findings of disability)(citing *Rutledge v. Liberty Life Assurance Co. of Boston*, 481 F.3d 655, 660 (8th Cir. 2007)); *Coker v. Metro. Life. Ins. Co.*, 281 F.3d 793, 798 (8th Cir. 2002) ("The determination that Coker suffers from a pain-based disability under Social Security regulations does not require MetLife to reach the same conclusion.") (citing *Schatz v. Mutual of Omaha Ins. Co.,* 220 F.3d 944, 950, n.9 (8th Cir. 2000); *Ciulla v. Usable Life,* 864 F. Supp. 883, 888 (W.D. Ark. 1994) ("ERISA plans are not bound by Social Security determinations, and this court owes no deference to findings made under the Social Security Act.")).  Additionally, the Court agrees with the Plan that the ALJ's conclusions in Mr. Nichols's case are consistent with Dr. Lieberman's findings and actually provide additional support for the denial of Total Disability benefits.  (Dkt. No. 19, at 14-15).

In sum, the Court finds that the Plan Trustees did not abuse their discretion in denying LTD benefits based on a finding that Mr. Nichols was not totally disabled within the meaning of the Plan.  The Court finds that substantial evidence supports the finding that Mr. Nichols was not totally disabled and determines that it was reasonable for the Plan Trustees to require objective clinical documentation to support Mr. Nichols's claim for total disability, especially in view of

the Trustees' "obligation to protect the plan's trust property by ensuring that disability claims are substantiated." *Pralutsky*, 435 F.3d at 841. The Court also rejects Mr. Nichols's request in his reply brief that the Court remand this case for a further IME. Such a remedy would be based on a finding that the Trustees' abused their discretion in determining that Mr. Nichols was not totally disabled. Because the Court finds no abuse of discretion, there is no need to consider remand.

Viewing the record evidence in the light most favorable to Mr. Nichols, the Court finds that there is no genuine issue of fact to be determined on his claim that the Trustees abused their discretion, and the Plan is entitled to judgment as a matter of law on Mr. Nichols's claim. Therefore, the Court grants summary judgment in favor of the Plan on Mr. Nichols's claim against it.

## IV.   THE PLAN'S COUNTERCLAIM

Mr. Nichols denied overpayment in his answer to the Plan's counterclaim (Dkt. No. 9). However, he admits overpayment in his responsive briefing (Dkt. No. 20, at 4) ("Because Mr. Nichols was approved by the Social Security Administration for disability benefits, an overpayment exists from his prior receipt of long-term disability benefits."). Nonetheless, Mr. Nichols claims that "it is unclear from defendant's letters to Mr. Nichol[s] whether [the Plan's] calculation is accurate. For example, the [SSDI] Program has a five-month waiting period prior to the payment of disability benefits" (*Id.*). Mr. Nichols requests that the Plan "provide a specific calculation of its overpayment in order that a determination be made as to its accuracy." (*Id.*).

The Plan has not replied to this brief and has not addressed this request. However, the Plan states in its original briefing, and the record shows that the Plan sent Mr. Nichols multiple

letters stating, its specific calculation of overpayment.  The record contains further details on the Plan's math (Dkt. No. 16, R. 185).  As to Mr. Nichols's argument that the SSDI's "five-month waiting period prior to the payment of disability benefits" may not have been accounted for, the record already contains information on this issue (Dkt. No. 20, at 4).  Mr. Nichols's notice of award states that he became disabled under the SSA's rules on April 7, 2008, informed him that he had to be disabled for a full five calendar months in a row before being entitled to benefits, and therefore, explained he was entitled to monthly disability benefits beginning October 2008 (Dkt. No. 16, R. 186).  In addition, the notice of award specifically lists Mr. Nichols's monthly SSDI income as $1,248.20 beginning October 2008 and $1,320.50 beginning December 2008 (*Id*.).  The notice of award stated that Mr. Nichols was to receive $9,792.00 on August 30, 2009 for past-due benefits for October 2008 through July 2009, and the notice of award stated that he would thereafter receive month payments of $1,320.50 (Dkt. No. 16, R. 186-87).  His past-due benefits for October 2008 through July 2009 totaled $13,056.00, but his fee arrangement for his social security appeal provided for $3,264.00 for his representative's fees (*Id*. at 187).

Because the Plan provides that any payment of LTD benefits is subject to offset in the event the recipient of the benefits received income from other sources, the Plan is entitled to judgment on its counterclaim in the amount of $11,028.00.  *See Pilger v. Sweeney*, 725 F.3d 922 (8th Cir. 2013).  Although Mr. Nichols purports to contest or question the amount of the offset due, the record includes sufficient factual matter to justify the Plan's request.  Mr. Nichols was privy to the record, could have challenged the Plan's calculation in a meaningful way, yet opted not to do so in response to the Plan's request for summary judgment.

*      *      *

For these reasons, Mr. Nichols's motion for summary judgment is denied (Dkt. No. 17). The Plan's motion for summary judgment is granted (Dkt. No. 18).  Mr. Nichols's complaint is dismissed with prejudice.  The Plan is awarded judgment in the amount of $11,028.00 on its counterclaim.

SO ORDERED this the 30th day of September, 2013.

_____
Kristine G. Baker
United States District Judge